Good morning. Good morning, Your Honors. My name is Justin Pideaux. I'm a certified law student at the Stanford Environmental Law Clinic, representing appellants in this matter, and I would like to try to reserve five minutes of my time for rebuttal. This case has a long history. The threshold issue for purposes of this appeal occurred in 1998, when the federal government decided to extend two leases set to expire by their own terms, giving Calpine the right to build a geothermal industrial complex in the heart of the Medicine Lake Highlands, the Holy Land of the Pit River Tribe. While the specifications of this complex were to come, no environmental review, no tribal consultation, or even public notice occurred for this fundamental decision about the future of these federal lands. As they have for tens of thousands of years, members of the Pit River Tribe learn religious teachings, pray, and seek spiritual renewal in the sacred landscape. It is the church of the tribe. The 1998 decision to commit these lands to geothermal extraction and the subsequent decision-making process that approved the layout of the plant were the culmination of a decades-long shell game. At each step, the federal government had pointed into the future, saying that it would one day conduct a full environmental analysis of the impacts of and alternatives to industrial development of the Medicine Lake Highlands. Then, when it approved the Four Mile Hill plant, the federal government pointed backwards, saying that the time to consider this range of possibilities for the management of these lands had long since passed. You argue no consultation with the Pit River Tribe. Is that your argument? For the 1998 lease extensions, Your Honor, yes. Let's go back a little bit in history. When this process first started, didn't the agency send out a request for comment, letters, et cetera, to a number of individuals, including Pit River? You're referring to the 1981 and 1984 environmental assessments, Your Honor? The Pit River did not respond. That is correct, Your Honor. And isn't it correct that the lessee under this proposed plant hired someone who went out and interviewed 30 or so members of the tribe? Yes, Your Honor.  For the decision? For the 2000 record of decision. You know, that's a little bit different than saying there was absolutely no consultation with the tribe. There was. Your argument is that it was insubstantial, not sufficient. Is that your argument? Your Honor, my argument is, with respect to the consultation that was done for the 2000 record of decision, that that was done at a time when the government had — and for a decision-making process in which the government had already committed itself to this geothermal extractive use, and therefore it is not sufficient, because that consultation needed to occur before the government vested these rights in Calpine in 1998. I guess this gets to the basic purpose for environmental impact statements, environmental assessments, et cetera. The district court, in its order, centered in on this, that the is for full disclosure, so that people know what the impact of a proposed agency action is going to be. And in this case, the district court concluded that there was that full display of information. And I guess that sort of folds into the question of whether the tribe's position is, is there an alternative to the building of this plant, or is it leave this land pristine, nothing can be done there? How do you respond to those two points? I'd also like to get back to the 1981 supplemental environmental analysis in a moment. But I think the fundamental flaw with this decision-making process, I mean, it may have disclosed what the impacts are of development. In fact, the environmental impact statement found that there would be significant unavoidable impacts on religious and cultural resources in this area. However, another key point of the National Environmental Policy Act process is a full consideration of the range of alternatives. What's the alternative? Is there a way to build a geothermal plant that does not impact the historic interest of the Pitt River and Klamath tribes in this area? Your Honor, but the primary to asking the question as you pose it, the government needed to first answer the question as posed first, and then get on with your explanation. I apologize, Your Honor. No, on these leaseholds, there's no way that we believe. There's no alternative. In the mind of Pitt River, there's no alternative. It's don't build the plant. No action. It is, do not build these plants on these leaseholds, yes, Your Honor. But there's not a way to place the transmission wires or to plug the wells or arrange them in a way that does not disturb what Pitt River considers safe. Your Honor, these lands are, as a whole, a landscape. I'm not arguing with the content of the question. I'm just asking the question. Yes, Your Honor. There's no way to build this plant, drill it, tap the geothermal resources under the electricity to Bonneville in a way that does not harm land that Pitt River considers sacred. On these leases, Your Honor, no, there's not. Let me ask you a question. When, at some point, the statutes require a hard look. In your view, when should the hard look have occurred? Your Honor, the hard look should have occurred at the leasing point. And that's what the ninth year, what year? In 1998. When these rights were reinvested. 1998. But that's not the leasing year. That's the extension year. Correct, Your Honor. Earlier on, a lease was entered into in which a determination had to be made as to whether or not they're going to allow them to go forward, et cetera, et cetera, and lease money is paid, et cetera. You don't consider that the hard look time because you don't believe there's an unalterable commitment of resources, et cetera? Okay. I don't think that's exactly my argument, Your Honor. That isn't what we're raising claims about today. Clearly, we're outside of the statute of limitations. We're raising claims about the 1988 leases. Okay. Well, then, turning to 1998, how do we deal, taking up with what my colleague has asked, I wanted your response. In 1995, three years before, when Calpine had their plan of operation, in reviewing the record, it seems to me, if I understand it correctly, the agencies conducted a NEPA review and distributed an environmental assessment for public comment in December of 1995. It was sent to the Pitt River Tribe. Pitt River Tribe did not comment. And at that time, the agencies made a finding of no significant impact. That might be argued as a hard look in which your clients were fully advised. They were sent a copy of the EA. How would you respond to that? Why wasn't that sufficient in 1995 to allow the 1998 extension? Your Honor, the 1995 environmental assessment solely looked at casual use and exploratory use. It was not an inquiry as to whether or not these resources should be irrevocably committed to an industrial geothermal extractive use. And that's the decision that occurred in 1998 when the government once again had the opportunity to decide whether or not these rights should remain vested. The rights that were granted under the 1998 leases expired by their terms in 1998. And under confederated bands and tribes of the Yakima versus the Federal Energy Regulatory Commission, that leasing decision is not simply a part of the continuing ongoing process, but another opportunity for the government to decide whether these resources are properly allocated. I may have been missing something. Didn't the original lease provide for extensions? The Geothermal Steam Act, Your Honor, provides for that the Secretary may grant extensions. May, it's conditioned. But it does have extension. Does it indicate whether they're five years or whether they're – because there's a five-year extension and a 40-year extension, as I understand it. Was that in the lease information? That was in the statute at the time, Your Honor, yes. So there is an overall understanding that it's moving along. Why is the extension more critical than what took place in 1995? Why isn't that sufficient? Because the scope of the 1995 review was simply too narrow. Never during any of this time in any document that the government can show you did they conduct a full analysis of the range of opportunities for Federal lands. These are Federal lands that the government, as stewards of those lands, has an obligation to look at the range of requirements. Furthermore, under the National Historic Preservation Act and Section 106 of that act, the government has an obligation to identify sites that are eligible for listing on the National Register and consult with the tribes in order to do that prior to a Federal undertaking. Now, nothing of that nature ever happened until the game had already been decided. And those vested rights had been granted. And, Your Honors, if we look at the record of decision, there is ample evidence that the government felt constrained in its decision-making process. For instance, Your Honors, at Excerpt of Record 298, under its rationale, the agencies write that the issuance of the Federal leases provided the leaseholder with the right to explore, develop, and utilize the geothermal resources within the boundaries of the lease. Later, at Excerpt of Record 299, when discussing Executive Order 13,004, the government notes that under 13,004, which is a policy statement by the government about avoiding impacts to Native American sacred sites, that Calpine Corporation has been issued Federal leases for the right to develop these resources. Thus, to the extent practicable under EO 13,004, adverse effects to sacred lands have been avoided, notwithstanding denying the leaseholders its right to use these lands. Now, we have also in the record, at Excerpt of Record 52, a briefing paper that was put out by the agencies in which it is noted that the agencies are strongly considering selection of the no-action alternative in this case. However, the Office of General Counsel and the Department of Interior solicitors has advised them that the denial of these projects would be a taking of private property rights associated with the leases. So throughout this process, it finally happens at the very end, we see that the government is under the specter of having already granted vested rights to Calpine Corporation and cannot fully examine the range of options. And, Your Honors, I would also draw your attention to the discussion that occurs of the no-action alternative. It is very cursory and conclusory. At Excerpt of Record 500, in the description of the alternatives, the EIS notes that under this alternative, the no-action alternative, the Four Mile Hill geothermal development project would not be implemented and the resulting environmental effects from implementing the proposed action would not occur. Several pages later, it's noted that this is the environmentally preferable alternative. However, the no-action alternative would not meet the purpose and need of the proposed action. That's all the discussion that exists. Indeed, the federal government doesn't even look at what it would really mean to deny this permit, given the fact that they believe at this time that denial of the permit would constitute a taking. So there's no analysis of what it would mean to buy back these leases. There's no analysis of what it would mean to do some sort of lease exchange to provide Calpine with lease opportunities elsewhere where these impacts would not be constituted. All of those things would need to be included for the federal government to deny these permits under at least the apprehension that they have, that Calpine has these vested rights. So what we see is that by the time these consultations are completed and by the time the environmental analysis is completed, it's too late. The decision has already been made. And that is exactly what the National Environmental Policy Act and the National Historic Preservation Act are designed to avoid. They are designed so that federal agencies have all this information at their disposal at the time that they make that go, no-go decision. When they made the go-or-no decision, you say that's at the time of the first five-year extension. Yes, Your Honor. What prevented the government from stopping the 40-year extension?  I mean, I think that what would prevent them from extending it would be that the 1998 If the 1998 extension was invalid, then they certainly had nothing to extend in 2003. So we're not – I mean, the 2003 extension, in fact, we were not made aware of that until the government's reply brief in the district court. So we don't have any claims about that issue. When the 40-year extension occurred, that was in 2002. Was that a significant point? That is, is that a time when there should have been a hard look? Or is it your argument from 1998 on there was no more hard looks they could take because the time it was passed? Your Honor, I think the government had multiple opportunities during this 30-year period to take this hard look. At any time, they could have done a full analysis of what it would mean to develop these leases and look at the various alternative management strategies that were available. And under the tiering provisions of NEPA, they could have relied on that analysis had they done it adequately. They could have done it through a forest plan amendment. They could have done it in those original 1980 environmental assessments. However, at each stage, they decided to defer that analysis. I wanted to get back to the 1984 environmental assessments, which we mentioned earlier just briefly. I mean, in those environmental assessments in 1984, the agencies specifically noted in one sentence that landscape-altering activities, this is an excerpt from Record 246, might have sort of adverse effects on the spiritual values of the Native American tribes, but they believed that through consultation, 100 percent of these effects would be mitigated. So the tribes relied on that. They relied on this promise that was contained in very terse terms in the 1984 Supplemental Environmental Assessment. One paragraph, as I recall. I think that's right, Your Honor, that they would be consulted. And given the fact that that 1984 Supplemental Environmental Assessment covered a very wide geography, they believed that, you know, maybe there are some sites. We don't know whether there are sites within the Glass Mountain geothermal resource area where development could occur without impacting the Native American religious values. And we don't know because the assessment was never done. I would like to reserve the rest of my time unless there are other questions. I don't see any. You've got almost four minutes. Thank you very much, Your Honors. Counsel? Good morning, Your Honors, and may it please the Court. My name is Andrea Berlow. I represent the United States in this matter. With me at counsel's table is Robert Maynard. He represents Calpine Corporation, our co-appellee in this case. Per the Court's instructions, we will be splitting our time approximately 15-5. Your Honors, there are a lot of issues floating around, particularly following the appellant's reply brief, and I'd like to organize them into two categories. First, there are those issues that we view as not justiciable. And second, those issues that we view as live. The not justiciable claims here are the 1998 lease extension, which we have argued is moot, and the 2001 lifting of the development moratorium, which we have addressed as not right. The live issues then become the challenges to the Four Mile Hill development project, which was approved in 2000 with the record of decision. There, the appellants make really only two claims against that document. One is a NEPA claim involving the purpose and need in the range of alternatives. The other is a National Forest Management Act claim involving plan amendments. As the Court aptly noted, what is at issue here is whether or not development should occur at all. The appellants argue that really there can't be any development in this area, and that goes to their argument regarding the range of alternatives considered under NEPA, because they have yet to provide any impacts that were not considered as part of the no-action alternative. All of the alternatives that they provide and that they state that the agency should have considered have impacts that are the same as the no-action alternative. And under the existing case law under NEPA, the agency is simply not required to examine alternatives that would have the same impacts as alternatives already considered, which is what they did here. And that statement, do I infer that it's the position of the government that there's no land in its portfolio suitable for geothermal plant building and power transmission that would not impact Native American sites? No, Your Honor. What's at issue here is the development under these two leases held by Calpine. That was the issue considered in the EIS. Whether it's appropriate to develop in these leases. BLM is not going to examine either lands that are not leased, lands that are leased, but for which there's been no proposal for development. The focus of this environmental impact statement, appropriately, is the development that is actually proposed by the lessee, and that is what they looked at. Not whether that development could take place on other lands. No, Your Honor, because that wouldn't have any impacts different from the no-action alternative. For this particular proposal, the corporation was proposing development on their leases, and, therefore, to look at development on other leases or in other areas of either BLM or Forest Service land would be the same impacts, would have the same impacts as no-action alternative. The Court also appropriately noted. Suppose this plant were under construction, and in drilling one of the holes they discovered that they were right on top of a previously unknown earthquake fault, and that if the plant development went forward, it could cause or contribute to a major earthquake. Are you saying the government at that point couldn't consider whether that development could be done elsewhere? No, certainly not, Your Honor. In fact, depending on the circumstances of the hypothetical, that could be information that would require a supplemental environmental impact statement in this case, and in that case, the government would be considering alternatives that would take into account this new information. But the alternative would be the same as doing nothing. Not necessarily. I mean, I'm not a geo... It's similar in that regard to what you just posited, isn't it? It could be similar, or there could be an adjustment made to the development that would account for the seismic information that was discovered. I mean, there could have been adjustments made to account for the particular impact at issue. Has the government changed its general policy with respect to the impact of activities on federally owned land in terms of the impact on tribal sacred places? Has that policy changed or shifted over the years? What time period are we talking about, Your Honor? From 1981 to present. Well, I would say that certainly the information has evolved from the time of the 1973 program. I'm talking generally. Okay. Nationwide. I can't speak to whether the government has changed its policy nationwide, Your Honor. But what I can say is for purposes of this case, information, the consultation process with the tribe was exhaustive. It began, as the Court appropriately noted, in 1995 when the development project was first proposed. And so at the time of the 1998 lease extension, there were several things that had already occurred. Number one, the draft environmental impact statement was already out for public comment. Number two, the ethnographic study that had been commissioned by Calpine Corporation had already, if it wasn't already completed, certainly the draft was already out. And so the tribal consultation had been ongoing throughout this process, and the government during that process was gaining the information it needed to gain in order to make a well-informed decision, as the statutes require. Importantly, the statutes don't require a particular outcome. They are procedural in nature. They require the government to gather the information, make its best decision based on all the available information. And, in fact, that's what was done here. So the government's position is that this particular activity and this particular location is no different than a timber sale or a mining activity, either of which is going to have some environmental impact upon lands or waters or properties adjacent to either. The fact that it's land that's historically and religiously significant to this particular tribe is no different. Well, it requires, I mean, certainly any decision that was made in this area that would have those similar impacts would have to consider the impacts on the cultural resources. So to that extent, it's not any different. What is different here is the presence of the Geothermal Steam Act, which does encourage the federal government to explore these alternative sources of energy and is the basis, really, for determining whether or not geothermal steam resources are going to be developed throughout the country, beginning back with the programmatic statement in 1973. I would like to ask a question, if I could. At one point, when the lease was first extended, there was a five-year moratorium placed upon any activity. While the agencies looked very carefully at this issue, one year into the moratorium, the moratorium was lifted because, as I understand it, the administration position shifted to try and overcome the problems we're having with securing energy without defiling the earth. At that point, the district judge did not feel that that was a problem because there could be a rational decision made based upon the change of process. That's not my question. My question is, it seems to me that when you withdraw the moratorium, it would be necessary under the Administrative Procedure Act to ask for comments. That was not done. And I'm wondering, A, whether or not that was improper for the agencies to withdraw the moratorium without asking for comment, and, B, whether or not, if it was improper, how that could be eradicated. That is, could the agencies go back and make up for that error? Well, Your Honor, to address the first part of your question, was it appropriate under the Administrative Procedure Act to withdraw the moratorium without notice and comment? I would note that the moratorium itself was imposed by the record of decision. So it wasn't imposed with notice and comment to begin with, and it's our position that it was a voluntary moratorium that was imposed in the record of decision without notice and comment, and, therefore, in order to lift it, more process under the Administrative Procedure than to impose it was not required. Well, there were certain rights that changed. All of a sudden the people who were concerned about what was going to happen to the Native American rights, all of a sudden they had five years in which to supply information to the government, which at the end of one year was terminated. Hasn't that changed the situation where they now have expectations and perhaps rights to where comment and notice would be necessary? No, it hasn't, Your Honor, and here's why. The consultation is ongoing, although it culminated in the memorandum of agreement and there's the consultation began, obviously, prior to that, and it was ongoing. In fact, one of the terms of the memorandum of agreement is that the consultation will remain ongoing. Various mitigation measures imposed through the memorandum of agreement and the record of decision require continued consultation from the tribe and gathering of information. To the extent, though, that any other project, any other development project were proposed, that would require its own process. So merely lifting the moratorium didn't have the impact of developing anything. There would have to be another decision to go forward with a project, as there was here in the telephone flat decision, which is being challenged separately. The moratorium did not have an end on it. It had at least five years, so the moratorium could go on forever with nothing happening. But at least now, assuming for the sake of argument that there, and I don't know the answer to this, but just assume that they did have a right to notice and comment, could the agencies now go back and say, okay, if we had left the moratorium on, it would have to be for at least five years, five years has passed, we can now take a second look at what we would have looked at then to see whether or not this project will impact upon the rights of the native Indians under the circumstances, or if there are some alternatives that could be made that would provide them with a reasonable opportunity to carry on their religious activities. Could that be done? I'm not sure I understand your question, Your Honor. I'm trying to undo, you know, once the egg is broken, it's very hard to put it back together again, but it strikes me in this case that if notice and comment were necessary, that the agency could at this juncture say, give us notice and comment, five years have passed, we've had observation enough, tell us what you think we should know, and we can look now at what we know and make a decision. Would the agency have had the authority to do that? The answer is yes. But does the law require the agency to do that? We think the answer is no. Yes, unless the agencies are wrong in not asking for notice and comment earlier. By earlier, are you referring to the issuance of the moratorium? The time they lifted the moratorium. At the time they lifted the moratorium. So the real issue is it could be done, but your response is it isn't necessary because you didn't have to give notice and comment before lifting the moratorium. Well, that's part of my answer, yes, that's correct. First of all, it didn't have to be done because it didn't require notice and comment. Second of all, the consultation has been ongoing. Yes. And third, the third part of my answer would be that there would be no development project automatically authorized by lifting of the moratorium. There would have to be another proposal for development to have any additional impacts. Okay. No, I'm just saying at some point you were going to take a hard look based upon new evidence, and I'm just wondering whether that was one of the hard look points. But as you say, unless there was some right they had to notice and comment at the end, at the lifting of the moratorium, that doesn't fit. That's correct, in addition to the fact that unless there was some development project, there would be no further impacts. If you look at the entire area, I understand your answer to Judge Hawkins' question that you may not have been required in consideration of the no-action alternative to discuss alternative sites. But can you tell me, as a matter of fact, in this entire geothermal area, are there sites that would not impact the cultural and historical or religious rights that the tribe may have? Are we talking about the entire Glass Mountain KGRA known geothermal resource area? Yes. I'm not aware of whether there are other sites within the entire KGRA that would not have these impacts. However, again, it's our position that it doesn't require it because these are issues. I understand your first part of the answer. So the second question then is, did you ever consider doing exchange leases or looking into that as an alternative? Again, those impacts would be the same as no action. I mean, what you try to do is solve the problem because you have development rights. You've granted to Calpine. You've discovered that there, despite consultation, there are irreconcilable differences with the tribe. And a part of resolving that, you can do exchange leases, correct? For another part of the same KGRA. Yes. Although that is certainly possible, it's not required by NEPA here, again, because we believe that the impacts that the tribe is complaining about are the impacts within these lease areas, based on this project. You wanted to give Calpine Council five minutes? Yes, I did, Your Honor. Right at it. Thank you. Thank you for your argument, Counsel. Thank you. If it pleases the Court, I am Bob Maynard, representing Calpine as appellee this morning. Let me just address a few points that have come up, and then I'll try to emphasize a few points in my five minutes. In terms of the issue about whether an exchange is some way to get at this, a couple of points there. Calpine owns basically all the leases in this geothermal unit, geothermal leasing area. So from that point of view, exchange was never a starter. I've never heard the appellants bring up the idea of a land exchange in the same area as some way to solve the problem. They've consistently opposed any kind of geothermal development in this entire area. They claim the Medicine Lake Highlands as hundreds of thousands of acres surrounding this known geothermal resource area. Also you've acquired all the leasehold rights to what you believe would be the geothermal development on the Glass Mountain area. Yes, Your Honor. There may be some odd leases out there that other people own, but basically my understanding is it's fully leased. You picked these two leases for development out of all the other leases you had. Yeah, and that's another important thing about the geothermal sequence of development that the agencies have recognized and that this court at least I think certainly the program EIS that this court looked at in Sierra Club v. Hathaway back in the late 70s regarding geothermal leasing recognizes that geothermal is where you find it. They issued leases in the 80s. All kinds of exploration activity was necessary to find where there might be a viable geothermal resource. It was found at Four Mile Hill. The applicant comes forward with a proposal for a plan of development. The agencies look at that in terms of whether to approve it. In terms of any alternative that would look elsewhere, again, looking in the St. Neil and geothermal resource area, won't satisfy these appellants. They would perceive impacts on the cultural, spiritual significance of the area to them. Looking at someplace else is just like the no action alternative and far too broad. The programmatic documents in the 80s really looked at where to pursue development of geothermal on federal public lands, and it came down to these known geothermal resource areas. And then within those you authorize exploration to look to where the resource is. You've got to have the power plant within a mile of the resource in terms of the heat that's in the EIS, or it's not viable. So there's a real reason to focus on a particular site, on particular leases, in terms of a feasibility go-no-go decision on a development project. Let me ask you one quick question, and I realize this is sort of outside the scope of what we're talking about, but it helps me in my analysis. Is it Calpine's position that the rights it acquired in 1998 were sufficient, that if the government were to stop the project now you'd have a takings claim? Calpine believes the leases provide at least an opportunity to have a development project considered and approved, and we do believe that the government can't unreasonably deny that. And we fully recognize this sequenced phased process set out in the agency regulations. The lease rights are subject to those regulations and this phased process where you've got to submit a plan of operations and get a specific approval before a development project can go forward. Consistently and contrary, I think, to what appellants are representing, although the agency talked about lease rights, they didn't consider, if you look at the total record of decision and the factors they looked at in approving this development project, they never considered the lease rights that were simply renewed, just extended in 1998, to be a barrier to them considering the no-action alternative, and they considered it in lots of detail in the EIS. It was not cursory at all. The appellant gave you a couple of passages, but it was full-blown there with the other alternatives, sometimes brief passages simply because that's what you see in the EIS is with the no-action alternative. It avoids the impacts of the action alternatives that you talk about. And they did not consider it a barrier to choosing the no-action alternative. They denied another project the same day that is referenced in their record of decision. So, yes, Calpine believes the lease that was conveyed in the 1980s outside the statute of limitations conveys some right to develop, but it did not constrain the agency's consideration of whether to approve or deny this development project. I have a question. I'm trying to figure out when the law requires the government to take the hard look. And in these kinds of cases where they're ongoing and a little more is done and a little more is done, it's very difficult. But it seems to me the whole case depends upon did the government, did the agencies properly identify that hard look time and did they respond effectively? Now, you indicate in 1985 when your company got the lease, at that point they had certain expectations, but there wasn't anything specific until what you referred to as the plan of operations, which occurred, which you submitted eight years later. But there was nothing specific in 1998 when the lease was extended that was done. The lease for another five years was in a private, unpublished letter. There was no additional EAs or AISs. I take it your position that the hard look should have been in 1995 when the plan of operation was developed. Your Honor, the real feasibility go, no go decision here concerns the development project. That's when you're deciding whether to allow, to make a real commitment to allow development on these leases. And that's what the agencies were focused on starting in 1995 with the submittal of Calpine's proposal. And they were engaged in ongoing consultation starting in late 1995, 1996. They had published a draft EIS in 1997 and were continuing that consultation when what they considered a routine lease extension came up. So they were entirely focused on the development proposal as the action, as the feasibility analysis, go, no go commitment. And during that period of time, all they did in the 1998 extension was allow the lease to remain in effect to allow that opportunity for development to be further looked at and a decision made. Then when does the agency look at the development project? They looked at it starting in 1995 and finishing with the May 2000 record of decision that does authorize the project. Okay. So the May 2000, the agencies approved the decision, and the ROD opposes a five-year moratorium. That's at the point that it took place. They approved it then, and that was the hard look, that they approved it and instituted a five-year moratorium. That is when they completed their hard look before they issued that record of decision. Okay. Now, where is the EIS that is different from or in addition to the one that was given in 1995 when the plan of operation was developed? Well, in 1995 was when they started the EIS process. They did not finish it until May 2000. California has been through an arduous process to get to this record of decision. The other thing in 1995 was an environmental assessment, which was one of the things that put the tribe on clear notice that things were going on on these leases, but that was about exploration drilling that is precedent to not a part of the development project. Now, if I was going to try and find the record of the agencies for the ROD in 2000, some environmental assessment, some type of document that shows they've looked at the whole thing and made a hard decision, where would I look? That is the project. The bulk of that is the four-volume project EIS that they began work on in 1995, ended with the May 2000 record of decision, and that is in the excerpts of record starting in volume two, I believe, of appellants. But it spans several hundred pages. In addition to that, there are the prior documents that that does reference regarding the leasing stage, the program, leasing EIS that's in the supplemental excerpts of records that the federal government submitted that looks at conservation, other forms of energy, other alternatives to pursuing geothermal leasing in these known geothermal resource areas. So your position is the hard look was made in 2000, and it could not have been made before the ROD took place? I don't think it would be practicable to look at it regarding a development project on these leases before you got to that stage. Okay. Thank you very much. Thank you for your argument. Rebuttal? Yes, thank you, Your Honors. I'm going to try to touch briefly on both the NEPA issues and also the National Historic Preservation Act issues. The range of alternatives that was included in the 2000 record of decision may well have been sufficient had the agencies conducted that analysis of that previous question of whether or not these lands were fit for geothermal exploration. And that is precisely the question that the Conner Court found required in an environmental impact statement. In Conner, the court was reviewing leases that were being granted by federal agencies for mineral extraction, and it said that if a lease does not contain a stipulation that prohibits any surface occupancy, an environmental impact statement needs to be done, because at that point the government is committing itself irrevocably down this path in creating the sorts of rights that we see in these leases. Now, as opposed to that sort of no surface occupancy stipulation, we have leases here in Actions for Records 72 to 78 that provide an exclusive right to drill for, extract, remove, utilize, sell, and dispose of all geothermal resources, together with the right to build and maintain necessary improvements thereupon. Now, that is very different from the leases, the kinds of leases, that Conner said did not require an independent environmental impact assessment. With respect to the one other thing I wanted to say about that, in reference to Judge Wallace's question about when should the hard look have occurred, the hard look should have occurred in 1988 when these initial leases were granted. It also should have occurred in 1998 when the government decided to reinvest these decisions, or in 2003. At any point, the government could have conducted that hard look on the predicate decision as to whether or not these lands are appropriate for this particular use rather than some other mixture of uses, recreational uses, you know, preservation for cultural use, you know, cultural values, any of those other uses. Well, the attorney for Calpine said until the ROD, you really don't know what they're going to do with it. Before then, it's planning and exploration, and indicates that in 1998, that was — there was no particular — there was just a continuation of looking up that. That's a little opposed to your argument. You thought in 1998 they should have had an environmental impact statement for the lease extension of five years. Your Honor, in 1998, the government could have determined what a project would have looked like. These are just two leases. We know what geothermal plants look like. It may not have been that they could have at that time looked at the directions that wires should have run and whatnot, but certainly in an environmental impact statement at that time around geothermal leasing, they could have said this is what it would look like to put these lands into geothermal development. This is what it would have looked like to manage these lands for recreational uses. This is what it would look like to manage these lands for their cultural values. They could have done that assessment at that time. But their argument is until you get down to 2002, you don't have enough detail because they haven't done enough planning and exploration. What's your response to that? What would be wrong with making the hard look in 2002 at the time that they moved forward with a 40-year program? Your Honor, if in 2002 they had conducted this broad scope analysis that we believe they should have done previously, but had they done it in 2002, then that would have been sufficient most likely. But they didn't do that in 2002. They allowed the leases themselves to dictate the range of options that the federal government would look at, rather than allowing the federal government itself to consider the kinds of things that it should consider. If I might just have one second to address the National Historic Preservation Act, Your Honor. There was never any consultation done on the leasing decision. And, in fact, consultations continue to this day. And the eligibility determinations that should have occurred previous to these projects could have been done at any time. These uses have been going on for tens of thousands of years. And, in fact, as early as 1984, the government acknowledges that it knows the parts of this area are eligible for the National Register, and yet it does nothing until, as part of its memorandum of understanding for the record decision in 2000, it finally says, okay, we'll create a cultural management plan. Now, my understanding is that that plan is continuing until this day. And, in fact, most recently the agencies have suggested that maybe this entire area is eligible. But those eligibility determinations should have been made long before these decisions were required, because that is what the National Historic Preservation Act requires. Under the Muckleshoot case, the Court noted that the National Historic Preservation Act is a stop, look, and listen statute. It requires the government to consider these things before committing itself. Your Honors, this is a place where we can put the egg back together. By unwinding these leases and allowing the government to conduct this kind of assessment without the shadow of vested rights hanging over its head, and with all of the full information about the eligibility determination and the consultations on hand, the government can make a different decision, and it may well, given the fact that this was a very hard call from all the evidence in the record. Thank you, Your Honors. Thank you. Thank both sides for their arguments. The case that's argued will stand submitted for decision. The Court's going to take about a 10-minute recess. When we come back, we'll start with Great Basin Mine Watch and then proceed to the Eknog case. We'll be out in about 10 minutes. All rise. This court is adjourned for 10 minutes.
judges: Wallace, Hawkins, Thomas